**HARTFORD ASSOCIATES, et al., Plaintiff,**

v.

**UNITED STATES of America, et al., Defendant.**

**Civ. A. No. 91–4585 (JCL).**

United States District Court, D. New Jersey.

March 30, 1992.

Thomas F. Crawford, Berlin, N.J., for plaintiffs Pinedge Dev. Co., Inc., Stephen Samost, Branin Farms, Main Line Realty and All Land Realty.

Carl D. Poplar, Cherry Hill, N.J., for plaintiff Hartford Associates and Joseph Samost.

Kaye A. Allison, Asst. U.S. Atty., Baltimore, Md., for defendants U.S., et al.

## OPINION

LIFLAND, District Judge.

Plaintiffs move for a preliminary injunction enjoining defendants from proceeding against them in a criminal action, and for the return or review *in camera* of documents seized during a search of plaintiffs' and plaintiffs' counsel's offices. Plaintiffs are the targets of an investigation into criminal violations of the Clean Water Act arising from activities conducted on their property in Elkton, Maryland. Defendants are the United States, Dominic Desderio (an FBI agent who conducted the search), Susan Helbert (an EPA enforcement agent from Philadelphia), eight unknown government agents, Jane F. Barrett, and AUSA Howard J. Weiner. Defendants will be referred to collectively as "the government" unless otherwise noted.

Plaintiffs seek the following relief in this application:

1) placing all documents in this action under seal;

2) directing that all materials seized from plaintiffs' offices be returned to plaintiffs or placed in the court's custody;

3) restraining and/or estopping defendants from proceeding with any enforcement action against plaintiffs;

4) declaring that plaintiffs' activities on its property are exempt agricultural activities under the Clean Water Act;

5) restraining defendants from inspecting, examining or using for any purpose the materials seized from plaintiffs' offices on October 7, 1991; and

6) permitting Joseph Samost and Stephen Samost and/or their attorneys to inspect all materials seized in the aforementioned search.

## FACTUAL BACKGROUND

Hartford Associates owns a 405–acre property in Elkton, Maryland. The principal of Hartford is Joseph Samost, and Hartford's attorney is his son Stephen Samost. The property has been farmed by local resident Randy Hutton ("Hutton") since the time Hartford purchased it in 1971, and is zoned solely for agriculture.

In 1990 Joseph and Stephen Samost met with Hutton and were informed that two areas of the property had poor drainage

which impeded the land's agriculture production. Hartford cleaned out the drainage "ditches" in the southwestern corner of the property in November of 1990.[1] The Samosts had previously conducted similar drainage improvements on their properties in New Jersey, hereinafter referred to as Branin and Highbridge. In both cases, the U.S. Army Corps of Engineers ("Corps") inspected the sites and determined that the drainage improvements constituted exempt agricultural activities under 33 U.S.C. § 1344(f) and therefore did not constitute a violation of the Clean Water Act, 33 U.S.C. § 1311. On Branin, the Samosts cleared and excavated ditches. On Highbridge, the Samosts attempted to "resuscitate" an abandoned cranberry bog, which they claim is identical to the work done by Hartford at the Elkton property, except for the fact that the Elkton property is actively farmed.

The New Jersey Department of Environmental Protection ("NJDEP") and the New Jersey Pinelands Commission brought separate suits over the drainage improvements conducted at Branin and Highbridge. The Corps did not join in the litigation, but rendered a determination at the request of the Pinelands Commission that the improvements did not violate the Clean Water Act. The courts in both cases initially determined that the improvements constituted exempt agricultural activities and therefore did not violate the Act. However, those determinations were recently reversed by the Appellate Division, which held that an issue of fact existed as to whether the excavations on the Branin and Highbridge properties were exempt agricultural activities.

In January of 1991, the Maryland Department of the Environment informed the Baltimore District of the Corps that fill material had been placed in a tributary to Perch Creek in Elkton, Maryland. It was determined that no application for a permit pursuant to the Clean Water Act had been obtained for such activity. *See* Defense Exhibit A at 3, paragraph 1.

On January 18, 1991 inspectors arrived at the Hartford property and requested that the excavation cease. Plaintiffs conducted no further drainage improvements on the property. On January 29, 1991 Alex Dolgos, an ecologist in the Enforcement Section of the Baltimore District of the Corps inspected the Elkton property and observed that Perch Creek had been dredged, and that the dredged material had been placed in the adjacent wooded wetlands. Dolgos also observed that trees had been uprooted and dumped in the wetlands. *See* Defense Exhibit A.

On February 20, 1991, the Corps notified plaintiffs that the dredging and filling of wetlands on the Elkton property constituted a violation of the Clean Water Act, and directed that all such activity stop. *Id.* at 3–4 paragraph 3.

On February 21, 1991, Dolgos delivered a letter to Stephen Samost requesting that no further work be performed at the site of the drainage improvements. In response to a request by Stephen Samost as to what options were available to Hartford, Dolgos replied that Hartford could either restore the site or litigate the matter. Samost agreed to restore the site and contacted the necessary parties to develop a restoration plan.

Stephen Samost received a letter dated May 24, 1991 from Dolgos' supervisor Thaddeus Rugiel ("Rugiel"), the Chief of the Enforcement Section of the Baltimore District of the Corps. Rugiel stated that the informal agreement between Dolgos and Hartford to restore the property to avoid legal action would not preclude further legal action by the Corps or any other federal agency. *See* Defense Exhibit C and D.

On June 12 and 13, 1991, a search warrant was executed at the Elkton property. *See* Defense Exhibit A. Hartford's attorney, Lawrence K. Liebesman, Esquire, was present. During this investigation soil, vegetation and water samples were taken

---

**1.** The government contests plaintiffs' characterization of the unnamed tributary as a "ditch". Rather, the government asserts it is clearly a tributary flowing into Perch Creek, which flows into the Elk River, which in turn flows into Chesapeake Bay.

and a topographic survey was performed. *Id.* at 7.

On June 28, 1991 Hartford's special counsel received a fax from Rugiel stating that the Corps did not consider Hartford's restoration plan to constitute a wetland restoration plan. Samost contacted Dolgos and the parties set up a meeting for July 1, 1991 to work out the details of the restoration.

Hartford continued to revise its restoration plans and submit them to Dolgos. Copies of the final restoration plan were forwarded to Cliff Bienko of the Soil Conservation Service and Dolgos on July 29, 1991. Thereafter, restoration commenced and was completed in August of 1991. The site was inspected on August 29, 1991 and it was determined that the initial wetlands restoration work had been performed pursuant to the approved plan. *See* Exhibit 22.

On August 17, 1991, President Bush signed the Johnston Amendment into law. As a result of the Johnston Amendment, the Corps issued a memorandum identifying three options available to handle enforcement actions "involving lands which the Corps or EPA has delineated as waters of the United States under the 1989 manual" where a judicial action has not yet been filed. The Amendment provides for an option to the landowner to elect a new delineation under the 1987 or 1989 Wetland Delineation Manual. Hartford asserts that the Maryland office of the Corps implemented a plan by which landowners could elect a new delineation, which was not adhered to in this case.

On October 3, 1991, Magistrate–Judge Simandle issued a search warrant encompassing plaintiffs' offices in New Jersey. *See* Defense Exhibit E. Judge Simandle created a procedure for handling privileged documents.[2]

On October 7, 1991 Dominic Desderio (FBI), Susan Helbert (EPA) and eight unidentified federal agents arrived at the offices of Hartford and Stephen Samost (located in the same building) and requested that all work cease. The agents searched the offices from 9:30 a.m. to 5:30 p.m. Stephen Samost was permitted to work with an agent posted at his door, but was not permitted to be present during the search of any office other than his own.

Stephen Samost states that Desderio determined that only the room occupied by Stephen Samost constituted the law office, thereby permitting a search of all the file cabinets and legal files located in other areas. He asserted the attorney-client privilege as to all of the documents seized. *See* Defense Exhibit F at paragraphs 3, 16. Samost asserts that client files and other documents covered by the attorney-client privilege were seized pursuant to the search warrant, despite the fact that many of them do not pertain to Hartford Associates or the property in question. Plaintiffs also assert that Judge Simandle's instructions attached to the search warrant were ignored by the agents, especially Desderio and Helbert.

In addition, an office in Hartford's building leased to Thomas Crawford, Esquire was searched, despite Crawford's assertion that the office was not covered by the warrant. The search was completed by the time Crawford contacted the Magistrate to complain that the search was improper.

According to Stephen Samost, most of the files seized were his, and due to Desderio's refusal to allow him to copy the nonlegal files, Samost is unable to determine whether the files contained information covered by the attorney-client privilege or the work product privilege. Samost also asserts that the seizure violated his clients' privacy rights.

Samost was permitted to copy his legal files pertaining to Hartford, although Samost complains that Desderio reviewed the files against the copies.

---

2. The documents would be placed in an evidence facility at the U.S. Attorney's office pending review by plaintiffs. Then Judge Simandle or his designee would review the documents over which plaintiffs claimed a privilege. As a result of this lawsuit, no review has been conducted.

After filing this action, plaintiffs moved in the District of Maryland to quash the subpoenas of three grand jury witnesses. This motion was denied on October 4, 1991.

In this action, plaintiffs seek a preliminary injunction enjoining the government from proceeding with its investigation or from bringing an enforcement action against Hartford, and a protective order relating to the documents seized.

## STATUTORY BACKGROUND

The Clean Water Act, 33 U.S.C. section 1251 *et seq.* was enacted to restore and maintain the integrity of our waters by controlling the discharge of pollutants at their source. Section 301(a) of the Act, 33 U.S.C. section 1311(a), prohibits the discharge of any pollutant into navigable waters without first obtaining a permit pursuant to section 404. Navigable waters is defined broadly as all waters of the United States, and includes wetlands adjacent to navigable waters. This definition of the Act has been upheld. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

A knowing violation of Section 301 subjects the party to criminal penalties of $5,000 to $50,000 per day of violation or imprisonment for up to 3 years, or both. A negligent violation subjects the violator to penalties of $2500 to $25,000 per day of violation and/or imprisonment for up to one year.

## DISCUSSION

### I. Preliminary Injunction

#### A. *Likelihood of Success on the Merits*

1. Court's authority to grant relief requested.

Hartford asserts that the court has the power to enjoin its threatened criminal proceeding, *citing Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) and *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* held that absent a showing of bad faith or harassment, a federal court would not enjoin a pending or threatened state criminal proceeding.

The government asserts that plaintiffs have no possibility of success on the merits because the court lacks the authority to grant plaintiffs' request and enjoin the government from investigating or prosecuting them for possible violations of the Clean Water Act.

■ The decisions to investigate and prosecute are within the prosecutor's discretion. *United States v. Batchelder,* 442 U.S. 114, 124, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979); *Community for Creative Non–Violence v. Pierce,* 786 F.2d 1199, 1201 (D.C.Cir.1986) ("The power to decide when to investigate, when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws ... when reviewing the exercise of that power, the judicial power is, therefore, at its most limited.") *See also Forsyth v. Kleindienst,* 599 F.2d 1203, 1215 (3d Cir. 1979), *cert. denied sub nom. Mitchell v. Forsyth,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981) ("the decision of the Attorney General, or a prosecuting attorney, to initiate a prosecution is not made in a vacuum ... [t]he right to make the decision ... must include some limited right to gather necessary information").

■ Therefore, federal courts are reluctant to intervene in investigations or prosecutions. *Reporters Comm. for Freedom of the Press v. American Tel. & Tel. Co.,* 593 F.2d 1030, 1065 (D.C.Cir.1978), *cert. denied,* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979) ("A party invoking equitable intervention in the criminal investigative process has a particularly heavy burden.... only the most extraordinary circumstances warrant anticipatory judicial involvement in criminal investigations.")

In *Deaver v. Seymour,* 822 F.2d 66 (D.C.Cir.1987), the D.C. Circuit addressed federal court power to enjoin a federal criminal proceeding. Deaver had challenged the constitutionality of the independent counsel provision of the Ethics in Government Act and sought to enjoin the counsel's exercise of prosecutorial authority. After the district court denied his request for injunctive relief, Deaver moved before the Court of Appeals for a stay pending the determination of the constitu-

tionality of the independent counsel provision. Deaver alleged that he would suffer imminent, irreparable harm from being indicted.

The Court of Appeals held that Deaver had no right to an injunction restraining a pending indictment in a federal court. *Id.* at 68. The court noted that the *Younger* doctrine permits federal courts to enjoin state criminal proceedings where the threatened prosecution chilled exercise of first amendment rights. *Id.* at 69. In all other circumstances, "a person asserting a constitutional challenge to criminal process has been thought to have an adequate noninjunctive remedy; he may raise his constitutional claim as a defense in the state criminal proceedings, once initiated." *Id.*

The court noted that *Younger* did not "necessarily control a petition for a federal civil injunction to restrain an ongoing federal criminal proceeding, and that the court could find no case in which a federal court restrained a federal prosecutor's investigation or presentment of an indictment. *Id.*[3] The court also noted that *Fed.R.Crim.P.* 12(b)(1) permits a criminal defendant to raise by motion a defense based on " 'defects in the institution of the prosecution.' " *Id.* at 70. The court found that Deaver's challenge was in essence an assertion that there would be a constitutional defect in the institution of any prosecution growing out of the independent counsel's investigation, which was the type of defense that Deaver could raise pursuant to Rule 12(b)(1). *Id.*

[A]s the District Court noted, Rule 12(b)(1) of the Federal Rules of Criminal Procedure permits any defendant to raise by motion, after indictment but before trial, a defense based on 'defects in the institution of the prosecution.' ... By implication, the existence of Rule 12(b)(1) suggests that appellant's constitutional challenge is not to be raised in a pre-indictment civil injunctive action. This implication is strengthened by the tradi-

tional reluctance, which we have discussed, of an equity court to interfere with criminal proceedings. And we think the limited appealability of district court orders denying pre-trial motions in criminal cases makes the implication that Deaver cannot bring this Rule 12(b)(1)–type claim in our Court inescapable. A District Court's denial of a pre-trial motion is ordinarily not considered a "final decision" appealable under 28 U.S.C. section 1291; the defendant must therefore stand trial and only after conviction may he bring the issue to the Court of Appeals.

*Id.* at 70.

Similarly, in *North v. Walsh*, 656 F.Supp. 414 (D.D.C.1987), the court refused to consider Oliver North's challenge to the Ethics in Government Act, in part because of the "strong" policy against intervention into ongoing criminal investigations. *Id.* at 420. The court noted "[c]ourts have almost never found that an ongoing criminal investigation imposes a sufficient hardship to the person investigated to warrant judicial review prior to his or her indictment" since "a party who seeks to enjoin a criminal investigation has a particularly heavy burden". *Id.* The court noted that the D.C. Circuit has permitted such equitable relief " 'only in the most extraordinary circumstances' ". *Id.*, citations omitted. The court went on to note that the Supreme Court has "routinely rejected collateral challenges which impede ongoing criminal investigations." *Id.*

The government should not be enjoined from investigating and bringing a criminal prosecution based upon its alleged failure to comply with the Johnston Amendment (discussed more fully *infra*). The government's alleged noncompliance may be raised by plaintiffs as a defense, in the event that the government chooses to pursue a criminal indictment against plaintiffs. The government also correctly notes that

**3.** The court noted that previously it had assumed, but not held in *Juluke v. Hodel,* 811 F.2d 1553 (D.C.Cir.1987), that under prior D.C. Circuit law a federal court may "justify enjoining future federal arrests and prosecutions that chill

the exercise of First Amendment rights". 822 F.2d at 70 n. 8. Hartford does not assert that its first amendment rights are threatened by its potential indictment under the Clean Water Act, thus these cases are inapposite.

the cases cited by plaintiffs are not to the contrary, as they did not involve civil challenges to potential criminal indictments. Plaintiffs' requested review of the government's investigation could serve to "chill" Executive Branch action. As noted *supra,* the adequacy of existing remedies, i.e. raising plaintiffs' claims as defenses to an indictment or moving to dismiss for failure to state an offense was the basis for the court's refusal to conduct an "accelerated and unorthodox judicial review" in *Deaver. See* 822 F.2d at 71. Hartford argues, as did Michael Deaver, that the investigation and potential criminal indictment violates its rights, which cannot be remedied later. The *Deaver* court noted, without deciding, that the plaintiff's rights can be vindicated by a reversal of a resultant conviction. *Id.*

The government also asserts that judicial review of its investigative activities would "seriously disturb the orderly administration of justice", prompting prosecutors to forego investigations of "obstreperous litigants" or to pursue prosecutions without full investigations. *See Imbler v. Pachtman,* 424 U.S. 409, 424–31, 96 S.Ct. 984, 992–95, 47 L.Ed.2d 128 (1976) (prosecutorial immunity).

Finally, the *Deaver* court noted its obligation to avoid constitutional questions where possible, especially where the constitutionality of a federal statute is challenged. The court noted that if Deaver were acquitted of the charges brought against him, the court would not have to reach his constitutional claims. As discussed *infra,* Hartford argues that the Clean Water Act is unconstitutional as applied to Hartford. As in *Deaver,* if Hartford does not become the subject of a criminal indictment or is acquitted, the court need not reach its assertion that the Clean Water Act is unconstitutional as applied to plaintiffs.

For the aforementioned reasons, the court concludes that it lacks authority to issue injunctive relief against investigation or prosecution.

### 2. Case or Controversy–Ripeness

■ The government argues that plaintiffs' claims are not ripe for review, therefore by denying the court jurisdiction since the complaint fails to establish a "case or controversy" under Article III of the Constitution.

In *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580–81, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985), the Supreme Court held that Article III ripeness is not satisfied if the threat of unconstitutional arbitrary action relates to claims of "'contingent future events that may not occur as anticipated; or indeed may not occur at all.'" (citation omitted). Thus, the Court rejected a challenge to the civil penalty provision of the Surface Mining Control and Reclamation Act by coal mining companies who had not had penalties assessed against them. *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 304, 101 S.Ct. 2352, 2374–75, 69 L.Ed.2d 1 (1981).

In this action, Hartford seeks an injunction against a potential future prosecution, i.e. "contingent future events". *Thomas,* 473 U.S. at 580–81, 105 S.Ct. at 3333. As the government notes, there is no certainty that it will bring an enforcement action, that the Department of Justice would authorize criminal proceedings, or that a grand jury would return an indictment against plaintiffs. *See Rockwell Int'l Corp. v. United States,* 723 F.Supp. 176, 178 (D.D.C.1989) (rejecting attempt to enjoin criminal charges where the grand jury proceeding and related administrative deliberations were "still in flux").

For the aforementioned reasons, plaintiffs have not presented the court with a case or controversy under Article III, since plaintiffs' claims are based on contingent future events and thus not ripe.

### 3. Propriety of Search

■ Plaintiffs allege that the search of the various offices was improper because it was not based on probable cause, the warrant was overbroad, and the search as executed violated their constitutional rights and privileges. Plaintiffs ask the court to order the return of the documents and to

enjoin the government from using the seized items for "any purpose".[4]

The government asserts that it had probable cause to search plaintiffs' offices, based upon the affidavit executed by agent Desderio. Desderio stated, based upon his own observations and information from an informant, that there was reason to believe that the wetlands on plaintiffs' property had been filled in violation of the Clean Water Act. Desderio further stated that plaintiffs' offices were located in one building and that the offices were interconnected. In addition, Stephen and Joseph Samost conducted "interrelated businesses" at their offices. This led the government to believe that it would find records relating to those responsible for the Elkton property, based upon its knowledge that the Samosts ran Hartford.

■ This court must give the Magistrate–Judge's probable cause determination great deference. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). To establish probable cause to search plaintiffs' offices, the government had to show "a fair probability" that evidence of a crime would be found there. *Id.* at 238, 103 S.Ct. at 2332.

■ Plaintiffs must show a "strong" likelihood of success on the merits to warrant a preliminary injunction ordering the return of the materials seized. *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 958 (3d Cir.1984).

Klitzman, an attorney, was the target of a grand jury investigation into mail fraud involving personal injury claims. The U.S. Postal Inspectors searched the law offices pursuant to 3 warrants, which authorized the seizure of both active and non-active personal injury files, as well as virtually all of the law firm's business records. As in this action, the plaintiff argued that there was no probable cause, that the warrants lacked particularity, and that the search was overbroad. The district court rejected

the first two grounds and granted the injunction based on its belief that the search was overbroad, since the inspectors examined and seized materials irrespective of their relation to the crimes alleged, and which were potentially privileged.

The Third Circuit approved of the district court's rejection of the plaintiff's first two grounds. However, the Third Circuit agreed that the search was overbroad, since the warrants permitted the inspectors to search *all* client files and all of the firm's financial records regardless of their connection to the personal injury files. *Id.* at 960. The court found that "[i]n effect, the warrants authorized virtually a wholesale search and seizure of the business records of the firm." *Id.*

The Third Circuit set forth a preferred procedure for obtaining documents from a law firm. If possible, the law firm should be asked to provide the documents voluntarily. If the law firm refuses, the authorities should follow a procedure which accommodates both the needs of the investigating authorities and the law firm's clients. In particular, the court approved of the procedure followed in California, where upon application to the district court, a master is appointed to examine *in camera* any documents which a law firm objects to producing. *Id.* at 962.

In *In re Impounded Case (Law Firm)*, 840 F.2d 196 (3d Cir.1988), the Third Circuit reversed a district court's issuance of an injunction ordering the return of documents seized from a law firm. In *Impounded Case*, after the Magistrate–Judge issued a warrant and the documents were seized, the law firm filed a complaint in district court seeking an injunction and damages for the improper search. The warrant authorized the search and seizure of only those files pertaining to the alleged tax and mail fraud. The district court issued the injunction based upon its belief that the warrant was overbroad under

---

**4.** As noted by the government, there is no support for plaintiffs' request for an injunction against any criminal proceeding based upon a violation of their fourth amendment rights. Rather, courts have permitted civil actions seeking the return of documents pursuant to *Fed. R.Crim.P.* 41(e) and 12, where a party's fourth amendment rights have been violated. Plaintiffs specifically state that they do not bring this action under these rules.

*Klitzman.* The Third Circuit reversed, noting that the court's reliance on *Klitzman* was misplaced, since the warrant and affidavit in *Impounded Case* specified the location and types of documents sought to establish the crimes alleged. *Id.* at 201. The Third Circuit was "satisfied" that the procedure required by the Magistrate whereby the government was required to obtain leave of court prior to examining any documents sufficiently protected any attorney-client interests. *Id.* at 202.

In this case, probable cause was based on the affidavit of agent Desderio. The warrant sufficiently described the place to be searched as 300–340 N. Cooper Road, where plaintiffs' offices are located. *See* Defense Exhibit A at 9 and Attachment A. The warrant was also tailored to permit only the seizure of specific categories of business records relating to the following Samost entities: Pinedge Development Co., Stephen Samost, Joseph Samost, Pinedge Corporate Center, Hartford Associates, All Land Realty, Main Line Realty, Branin Farms, Perch Creek, Frenchtown Road and Elkton Farm.[5]

Moreover, Magistrate–Judge Simandle issued a procedure to preclude unnecessary invasion of the attorney-client privilege of Stephen Samost's clients. *See* Defense Exhibit A.

Thus, it cannot be said that plaintiffs have a reasonable likelihood of success on the merits in challenging the search of their offices. Plaintiffs allege that they do not know whether or not privileged information was seized. As noted *supra,* Judge Simandle created a procedure providing plaintiffs with the opportunity to review the seized files for privileged items, and providing for his subsequent review *in camera* of files as to which plaintiffs claimed a privilege. On this record, there is no basis to believe that plaintiffs will be irreparably harmed by following this procedure.[6]

**4. The Johnston Amendment**

The Johnston Amendment was enacted in response to the 1989 Federal Manual for identifying and delineating wetlands. The 1989 Manual replaced the 1987 Manual, broadening the definition of property constituting wetlands.

The Johnston Amendment provides:

In addition, regarding Corps of Engineers ongoing enforcement actions ... involving lands which the Corps or EPA has delineated as waters of the United States under the 1989 Manual, and which have not yet been completed on the date of enactment of this Act, the landowner ... shall have the option to elect a new delineation under the Corps 1987 Wetland Delineation Manual, or completion of the ... enforcement action based on the 1989 Manual delineation, unless the Corps of Engineers determines, after investigation and consultation with other appropriate parties, including the landowner ..., that the delineation would be substantially the same under either the 1987 or 1989 Manual.

■ a. Procedure. Hartford asserts that the government is precluded from pursuing an enforcement proceeding against it due to its failure to follow the procedural mandate of the Johnston Amendment. In support of this argument, Hartford cites *Triangle Candy Co. v. United States,* 144 F.2d 195 (9th Cir.1944), in which the court reversed a criminal conviction under the Food and Drug Act due to the FDA's failure to comply with the mandatory provisions of that Act relating to enforcement proceedings. Hartford asserts that the Johnston Amendment provides that the landowner shall have certain rights, which the government must observe prior to bringing an enforcement action.

---

**5.** Stephen Samost testified in prior actions that his entire practice consisted of entities related to his land holdings, and that he had no independent clients. *See* Defense Exhibit A at 11.

**6.** The *Klitzman* court found irreparable harm from the law firm's denial of access to its files, especially since third parties (i.e. clients) were

affected by the search. 744 F.2d at 960. Unlike the search in *Klitzman* which entailed seizure of the entire records of the firm, *Id.* at 961, the search in this case was designed to seize only specific files. In the event that the search also included unrelated files, review by plaintiffs and Judge Simandle will correct that.

368

Hartford asserts that the Johnston Amendment was an effort to halt "overzealous" wetlands enforcement by Federal officials and that it requires the Corps and the EPA to re-analyze the facts underlying each enforcement action. Hartford asserts that an August 1991 Memorandum of the Corps indicates its intention to review all pending enforcement actions and discuss them with the landowner and decide to 1) proceed under the 1987 manual, 2) continue under the 1989 manual, or 3) drop the enforcement matter. *See* Plaintiffs' Exhibit 1. Hartford argues that the government has failed to elect one of these three options, and has instead proceeded with enforcement of the Clean Water Act in contravention of the Johnston Amendment.

The government argues that, accepting for purposes of this motion only that compliance with the Johnston Amendment is a prerequisite to indictment and that the Corps failed to comply, plaintiffs may only raise this as a defense to any indictment which the government may secure.

The court agrees with the government. As the D.C. Circuit noted in *Reporters Comm.*, 593 F.2d at 1065, "if the mere possibility of future government misconduct were sufficient to warrant such prophylactic relief, then the courts would be called upon to superintend virtually *all* investigative activity. Much more than the mere possibility of future official misconduct is needed ...". As in *Reporters Comm.*, plaintiffs raise a possibility that a future injury will occur, i.e. that the government in this case may proceed with enforcement without complying with alleged preconditions to enforcement. There is no basis, save for plaintiffs' assertions, to find that the Johnston Amendment or the Corps' memorandum are mandatory preconditions to bringing an enforcement action under the Clean Water Act.

■ b. Essential Element of Enforcement. Hartford asserts that in order to proceed with an enforcement action the government must perform a wetlands delineation under the 1987 Manual and then decide whether to elect a delineation under the 1987 or 1989 Manual. Hartford asserts

that the Government cannot perform a delineation on a restored site without information concerning the location of the 12″ depth to seasonal high water hydrology parameter on the property prior to restoration. Hartford believes that the government does not have sufficient information to permit it to elect a delineation under either Manual. Thus, Hartford argues that the government cannot prove an essential element of its enforcement and cannot proceed.

The government responds that it has sufficient data from the samples collected prior to restoration to determine whether the area is wetlands under the 1987 manual. In support thereof, it submits the Declaration of Alex G. Dolgos, which reads in full:

1. I am an Ecologist employed by the United States Army Corps of Engineers, Baltimore District Enforcement Section. I am responsible for the enforcement of the Corps of Engineers Regulatory Program for the Eastern Shore of Maryland. I have been in this capacity for the past seventeen years.

2. I have a Bachelor of Science degree in Wildlife Biology, and a Master of Science degree in Environmental Science. I have qualified in the federal courts as an expert witness in wetlands ecology on six occasions.

3. On June 12, and 13, 1991, I was on the Hartford Associates property located on Frenchtown Road in the town of Elkton in Cecil County, Maryland. On that day, the vegetation, soils and hydrology were sampled at various locations throughout the site, specifically in and around the disturbed area. The disturbed area was a result of an excavating, grading and filling operation.

4. The purpose of the sampling was to verify the presence of federally regulated wetlands, in and around the disturbed area.

5. The criteria of the 1989 Federal Manual for identifying and delineating wetlands were being utilized by the Corps of Engineers during that time. However, at that time, I was aware of the controversy over the 1989 manual and that

Congress was considering action which could require the Corps to utilize the 1987 Corps manual in the near future. Therefore, the data collected was also evaluated at this time utilizing the 1987 Corps of Engineers wetland delineation manual.

6. As a result, I have determined that the areas sampled on the aforementioned dates qualify as federally regulated jurisdictional wetlands as prescribed by either the 1989 or the 1987 wetland manuals.

7. Also, based on the data collected and samples taken on June 12 and 13, 1991, I can determine at this time, using pre–1989 criteria, that several areas where fill was placed at the Elkton property are wetlands.

8. I have also determined that the project which resulted in the grading and filling of the subject wetlands, took place in a natural drainage area on a large wooded tract and does not qualify for exemption from regulation under the Clean Water Act. Only a small portion of the project at the southeastern edge appears to be an attempt to provide drainage to an agricultural field.

This Certification directly contravenes plaintiffs' arguments, insofar as it establishes that a wetlands delineation was made under the criteria of the 1987 Manual as well as the 1989 Manual in use in June of 1991 (¶ 6) and that exemption from the Clean Water Act's prohibitions (discussed in more detail *infra*) is not available for most of the subject property (¶ 8).

If the 1987 Manual was used, the Johnston Amendment by its terms is not applicable. It applies to "ongoing enforcement actions ... involving lands which the Corps or the EPA has delineated as waters of the United States *under the 1989 Manual* ... (emphasis added). I accept the Dolgos Certification as to the use of the 1987 Manual criteria and conclude that plaintiffs' arguments which rely on the Johnston Amendment are not likely to succeed.

5. Lack of Subject Matter Jurisdiction

Hartford asserts that it has a reasonable probability of success on the merits because the court lacks subject matter juris-

diction over the enforcement action because: 1) the drainage improvements conducted on the property are exempt agricultural activities; and 2) the property has been restored.

■ a. Exempt Activities. Hartford asserts that the drainage improvements consisted of excavation of material from the ditches, and the placement of dredge spoils on the banks, the first of which is not illegal under the Clean Water Act. *See* 33 C.F.R. § 323.4. Moreover, Hartford asserts that its drainage improvements are exempt agricultural activities.

The Clean Water Act provides an exemption for agricultural activities:

(1) Except as provided in paragraph (2) of the subsection, the discharge of dredged or fill material

(A) from normal farming, silviculture, and ranching activities, such as plowing, seeding, cultivating, minor drainage, ...

(C) for the purpose of construction or maintenance of farm or stockponds or irrigation ditches, or the maintenance of drainage ditches;

is not prohibited by or otherwise subject to regulation under this section or Section 1311(a) or Section 1342 of this title.

(2) Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

33 U.S.C. § 1344(f).

Hartford asserts that the property is operated as a farm, and plaintiffs have no present plans to develop the property. Hartford cites cases which analyze the farmland exemption, focusing on whether the activities are part of an ongoing farming operation.

The determination of whether the drainage improvements performed on the property constitute an exempt activity involves the evaluation of a potential defense to a

potential enforcement proceeding or criminal prosecution. As discussed *supra,* this is unsuitable for a preliminary injunction proceeding. In any event, the Dolgos Certification directly opposes exemption for these activities.

■ i. Estoppel. Hartford also asserts that the government is estopped from denying that the agricultural exemption applies to the Hartford property in Elkton, based upon prior litigations involving the Branin and Highbridge properties, where allegedly similar drainage improvements were conducted.

The government responds that estoppel of a government agency is not appropriate and that in a similar case, the court refused to estop the Corps from enforcing the Clean Water Act (on the grounds that it failed to follow deadlines set forth in its own regulations). *United States v. Boccanfuso,* 882 F.2d 666, 671 (2d Cir.1989).

Hartford asserts that even if the court does not find that the Corps is legally estopped, it should find the Corps equitably estopped due to its prior approval of the same activities on the Branin and Highbridge properties.

The court does not decide the estoppel issue, since the New Jersey cases relied upon by Hartford were reversed by the Appellate Division. However, the court notes that contrary to Hartford's assertions, the record does not establish that the Corps found those activities to be exempt. Instead, the record merely shows that the court noted that the Corps determined that those properties were not "wetlands". Here, Dolgos concludes that the Elkton property constitutes "wetlands" (Certification, ¶¶ 6–7).

■ b. Restoration. Hartford argues that the government lacks subject matter jurisdiction to proceed with a criminal enforcement action because the site has been restored. Hartford cites no authority for this proposition, but asserts that it has found no cases in which an enforcement action was brought after restoration had been completed. Hartford notes that penalties imposed for violations of the Clean Water Act usually arise when the landowner ignores the requests of the Army Corps or orders of the courts.

There is no authority to support plaintiffs' position that the government cannot bring an action for a violation of the Act notwithstanding restoration of the property, nor would the court expect to find any; denying enforcement power where restoration has taken place would encourage violation of the Act, by limiting punishment to the cost of restoration.

### 6. Constitutionality of the Clean Water Act

Hartford asserts that if the court refuses to terminate the government's enforcement action, it must confront the constitutionality of the Clean Water Act, since the Act is unconstitutionally vague as applied to Hartford. Hartford also argues, without elaboration, that the application of the Clean Water Act to the facts of this case would violate its rights to due process and equal protection.

As noted in *North,* the court has an obligation to avoid constitutional questions wherever possible. Permitting the government to proceed and plaintiffs to raise their constitutional claims as defenses is preferable to deciding such an issue on the abbreviated record before the court.

### B. *Imminent Threat of Irreparable Injury*

Hartford asserts that the threatened loss of liberty as a result of the criminal prosecution constitutes irreparable injury. In addition, Hartford argues that the "ongoing" due process and equal protection violations are further evidence of irreparable injury, as well as the privacy violations and potential violations of attorney-client and work product privileges. Hartford asserts that there is no adequate remedy at law for the threat of a government enforcement in violation of its constitutional rights.

The government responds that plaintiffs' generalized allegations of harm, common to all criminal investigations, do not warrant equitable relief, *quoting Cobbledick v. United States,* 309 U.S. 323, 325, 60 S.Ct. 540, 541, 84 L.Ed. 783 (1940) ("[b]earing the

discomfiture and the cost of the prosecution for crime even by an innocent person is one of the painful obligations of citizenship.") The government asserts that if Hartford's allegations of harm trigger judicial review, then "virtually all criminal investigations are subject to judicial interference", and that plaintiffs have not alleged a due process violation, since if the government proceeds with an enforcement action, plaintiffs will have a trial.

The threat of irreparable injury is not such as to warrant injunctive relief, since the case is in the investigative stage and defendants may choose not to proceed against plaintiffs. By analogy, the requisite harm to justify federal judicial intervention in a criminal proceeding under *Younger* must be great and immediate, not the mere fact that the statute in question was not followed. Plaintiffs have alternative remedies, such as defenses to an indictment, or a *Bivens* action if the government has violated its fourth amendment rights. The procedure created by Judge Simandle protects plaintiffs' attorney-client privilege. Thus, plaintiffs cannot establish irreparable harm. As noted in *Reporters Comm.,* 593 F.2d at 1065, judicial interference with Executive action " 'is not the role of the judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action' ". (citation omitted).

### C. *Balance of Harms*

Plaintiffs do not discuss the balance of harms as between plaintiffs and defendants, but rather assert that third parties have suffered and will continue to suffer harm arising from the allegedly improper search, and assert that defendants will experience no harm from the issuance of an injunction. The government correctly asserts that its law enforcement efforts would be impaired by an injunction, stating that interference with its investigative processes would threaten its ability to investigate beyond this case and chill a prosecutor's efforts to investigate without fear of judicial intervention.

The balance of harms, in light of *Deaver* and *North,* is clearly in favor of the government.

### D. *The Public Interest*

Hartford asserts that the public interest would be served by the issuance of a preliminary injunction by "requiring adherence to the rule of law", i.e. the Johnston Amendment and the Constitution. Hartford also asserts that the Johnston Amendment evidences a public interest in halting enforcement proceedings as to wetlands violations. Finally, Hartford states that the public interest is served by promoting agriculture and farming.

The public interest is not served by interfering with the Executive Branch's authority to control pollution by enforcing the Clean Water Act. Whether that enforcement is in accordance with the rule of law will be determined in such enforcement proceedings as eventuate.

### II. In Camera Review of Documents

In the event that the court permits the government to proceed with the enforcement action, Hartford requests that the court review *in camera* each of the documents obtained in the search of plaintiffs' offices on October 7, 1991. Hartford asserts that this review is necessary to prevent further intrusion upon the privacy rights of plaintiffs or their clients. Hartford also seeks to prevent "investigative use of the seized materials".

Plaintiffs seek access to the documents to determine which documents are covered by the attorney-client or work product privileges, which plaintiffs believe will furnish the basis for "seeking further protection by means of injunction". This access is also necessary to prevent disruption of Stephen Samost's law practice and Hartford's business. Hartford admits that some of the material seized is not privileged, but asserts that without review it is unable to determine which documents privileged. Hartford argues that the government is not harmed by this review, since the documents will remain in the custody of the court.

Hartford requests the immediate return of all strategy notes, memoranda, correspondence between counsel, drafts of documents and other work product materials relating to this action which were seized by defendants. Hartford also requests the immediate return of the documents seized from areas deemed not to be a part of Samost's law office, since it asserts that the documents are covered by the attorney-client privilege.

Finally, as noted *supra*, Hartford seeks the review and return of the files and documents which have no relation to Hartford Associates or its property, to prevent undue interference with its business.

The court feels that there is no basis for issuing an injunction, in view of the procedure created by Magistrate–Judge Simandle.